UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DYLAN DEWITT BANKS, | ) |
| | ) |
| Plaintiff, pro se, | ) |
| | ) |
| v. | ) 1:04CV199 |
| | ) |
| B.J. BARNES, CHUCK WILLISON, | ) |
| H. JACKSON, DR. HASSAN, and | ) |
| MIKE WALLS, | ) |
| | ) |
| Defendants. | ) |

### RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on motions for summary judgment by all Defendants (docket nos. 31 and 59) and on a separate motion for summary judgment brought by Plaintiff (docket no. 46), as well as on various other motions brought by Plaintiff primarily related to discovery issues. Because the parties have not consented to the jurisdiction of the magistrate judge, all dispositive motions must be dealt with by way of recommendation. For the reasons stated herein, it will be recommended that the court grant Defendants' motion for summary judgment on the ground that Plaintiff has failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

**I. Background**

This is a case by a pro se prisoner alleging deliberate indifference to serious medical needs. Plaintiff was arrested on February 17, 2001, and he was booked into

the Guilford County Detention Facility ("GCDC") in Greensboro, North Carolina, in the early morning hours of February 18, 2001. Plaintiff remained in custody at the GCDC until he was transferred to the North Carolina Department of Prisons, Central Prison, in Raleigh on June 15, 2001. Plaintiff has filed a 42 U.S.C. § 1983 complaint in this court (dated February 17, 2004, and file-stamped March 5, 2004) against four named Defendants based on deliberate indifference to medical needs that allegedly arose while Plaintiff was incarcerated at the GCDC. By previous recommendation and adopted order, Defendant Walls has been dismissed as a Defendant. The remaining Defendants have now filed motions for summary judgment, and Plaintiff has also filed his own motion for summary judgment.

**II. Facts**

According to Plaintiff's allegations, Plaintiff was examined by Defendant Dr. Hassan for the first time on March 21, 2001, nearly a month after being admitted to the GCDC. Plaintiff contends that during the month before he was able to see Dr. Hassan and during the months in which Plaintiff was under Dr. Hassan's care before being transferred from the GCDC, the prison staff, medical staff, and Dr. Hassan were all deliberately indifferent to his medical condition of ulcerative colitis. The complaint specifically takes issue with the amount and type of medication prescribed by Dr. Hassan.

Plaintiff's medical records show that Plaintiff received his routine physical intake examination at the GCDC on March 1, 2001. On March 18, 2001, Plaintiff

2

requested medical treatment for a flare-up of his ulcerative colitis for the first time since entering the GCDC.[1] On that day, Dr. Hassan received a page from the GCDC regarding Plaintiff's complaints on that date. Dr. Hassan called the facility and ordered Prednisone for Plaintiff at 60 milligrams with a 5 milligram taper and he also ordered Tylenol at 650 milligrams. Dr. Hassan further instructed employees at the GCDC to put Plaintiff on medical watch until Dr. Hassan could physically examine him. Dr. Hassan also prescribed that Plaintiff receive a specimen cup for stool samples. On March 21, 2001, Dr. Hassan examined Plaintiff at the GCDC. At that time Plaintiff had no complaints, and he denied having any blood in his stools. Dr. Hassan instructed Plaintiff to remain on his current medications and to begin taking Tagamet. On March 23, 2001, Dr. Hassan prescribed Hydrochlorothiazide and Verapamil to treat high blood pressure. On March 27, 2001, Dr. Hassan prescribed Plaintiff Tylenol, 650 mg for ten days.

A jail nurse received sick calls from Plaintiff on five dates while he was housed at the GCDC. On April 13, 2001, a jail nurse received a sick call from Plaintiff regarding a flare-up of his ulcerative colitis. On April 14, 2001, Dr. Hassan prescribed 650 milligrams of Tylenol to Plaintiff, and on April 18, 2001, Dr. Hassan

---

[1] Plaintiff did indicate on a receiving screening form dated February 18, 2001, that he had been treated in the past for ulcerative colitis, but he has presented no evidence that he requested medical attention for this condition at that time or at any time before March 18. *See* Defs.' Ex. 2, attached to Defs.' Reply Brief (docket no. 63-3). Furthermore, Plaintiff told nurses that he was taking prescription medicine for his condition, but when a nurse later attempted to verify the medications on March 18, 2001, she discovered that Plaintiff did not have any current prescriptions at any of the pharmacies that he had named. *See* Ex. 1 to Defs.' Reply Brief (docket no. 63-1).

prescribed to Plaintiff extra strength Tylenol, Flagyl, and 60 milligrams of Prednisone to be tapered in 5 milligram increments. On May 5, 2001, a jail nurse received another sick call from Plaintiff regarding a flare-up of his ulcerative colitis. On May 6, 2001, Dr. Hassan prescribed to Plaintiff 30 milligrams of Prednisone to be tapered by 5 milligrams daily. On May 13, 2001, Dr. Hassan also prescribed to Plaintiff Ensure at meals and a daily multivitamin. On May 15, 2001, and on May 18, 2001, a jail nurse received additional sick calls from Plaintiff regarding a flare-up of his ulcerative colitis. On May 19, 2001, Dr. Hassan prescribed to Plaintiff 650 milligrams of Tylenol, 400 milligrams of Tagamet, and 500 milligrams of Flagyl. Dr. Hassan also prescribed to Plaintiff 20 milligrams of Prednisone to be tapered in 5 milligram increments. Finally, on June 5, 2001, a jail nurse received another sick call from Plaintiff indicating that Plaintiff had bad diarrhea, and he was treated with Kaopectate on the same day. As previously noted, Plaintiff was transferred from the GCDC to the North Carolina Department of Prisons, Central Prison, in Raleigh on June 15, 2001.

**III. Discussion**

Under the Prison Litigation Reform Act ("PLRA"), a prisoner bringing an action "with respect to prison conditions" under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. 42 U.S.C. § 1997e. Section 1997e's exhaustion requirement is now mandatory. *See Anderson v. XYZ Correctional Health Servs.*, 407 F.3d 674, 676-77 (4th Cir. 2005) (citing *Porter v. Nussle*, 534 U.S. 516, 524

(2002)). It is clear, then, that the PLRA requires exhaustion of any administrative remedies that are available to the inmate. *Abney v. McGinnis*, 380 F.3d 663, 667 (2nd Cir. 2004). "To be 'available' under the PLRA, a remedy must afford 'the possibility of some relief for the action complained of.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

Here, Defendants have presented evidence that the GCDC has grievance procedures that are certified as being in accordance with § 1997e and that are made available to all prisoners at the GCDC.[2] Plaintiff has admitted in his complaint, however, that he did not go through any of these available grievance procedures based on his allegations of deliberate indifference to serious medical needs. He further admitted in the complaint that he also did not present the facts relating to his complaint through the State Inmate Grievance Procedure. Plaintiff has not argued that he was denied the opportunity to bring a grievance while housed at the GCDC between February 18, 2001, and June 15, 2001. Indeed, Plaintiff has not even responded to Defendants' exhaustion argument.[3] In any event, any argument by Plaintiff that he is somehow excused from exhaustion because he was transferred

---

[2] The administrative grievance procedures of the Guilford County Sheriff's Office are nationally certified under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997(e) and have been certified since 1995. *See* Jackson Aff. 5 & Ex. A. Inmates are informed of the procedures when they are booked into the facilities and can request a copy of the Inmate Handbook for additional information, or they may ask the officer on the floor how they can file a grievance.

[3] Defendants Willison and Jackson raised the exhaustion argument in their motion for summary judgment, and Plaintiff never filed a response to the motion, nor has he otherwise addressed the exhaustion argument.

5

to Central Prison on June 15, 2001, would be without merit because he clearly had the opportunity to bring a grievance while still incarcerated at the GCDC. *See Santiago v. Meinsen*, 89 F. Supp. 2d 435, 440-41 (S.D.N.Y. 2000) (dismissing action for failure to exhaust where the plaintiff's excuse for not bringing a grievance was his transfer to a different facility three weeks after the incident at issue). Furthermore, even if Plaintiff cannot now exhaust his administrative remedies since he is no longer housed at the GCDC, the law is well established that there are no futility or other exceptions to the exhaustion requirement under the PLRA. *Booth*, 532 U.S. at 741 n.6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise . . . ."); *Cox v. Mayer*, 332 F.3d 422, 425 (6th Cir. 2003) (stating that the exhaustion requirement applies to a former prisoner who filed his complaint without exhausting his administrative remedies and who had since been released from custody). Accordingly, it will be recommended that the court dismiss this action without prejudice based on Plaintiff's failure to exhaust his administrative remedies.

**CONCLUSION**

For the reasons stated herein, it is recommended that the court **GRANT** Defendants' motion for summary judgment (docket nos. 31 and 59), **DENY** Plaintiff's motion for summary judgment (docket no. 46) and dismiss this action without

prejudice to Plaintiff for failure to exhaust administrative remedies.[4] Furthermore, Plaintiff's motions for extension of time to complete discovery (docket no. 37), to appoint counsel (docket no. 39), and to allow Plaintiff to proceed with belated filings (docket no. 67) are all **DENIED**. Furthermore, to the extent that Plaintiff purports to bring a motion for discovery sanctions against Defendants in the document docketed as no. 49, that motion is also **DENIED** (docket no. 49). Furthermore, Defendants' request for imposition of sanctions based on Plaintiffs' own request for sanctions (docket no. 53) is likewise **DENIED**.

_____
Wallace W. Dixon
United States Magistrate Judge

December 12, 2005

---

[4] To the extent that Defendant Walls was previously dismissed *with* prejudice, the court should contemporaneously enter an order to reflect that the dismissal of Walls is without prejudice to Plaintiff.